IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JAMAL ALBERT JENKINS,<br><br>                    Petitioner,<br><br>vs.<br><br>JAMES A. YATES, Warden, Pleasant Valley State Prison,<br><br>                    Respondent. | No. 2:11-cv-00288-JKS<br><br>MEMORANDUM DECISION |

Jamal Albert Jenkins, a state prisoner appearing *pro se*, filed a Petition for a Writ of

Habeas Corpus under 28 U.S.C. § 2254.  Jenkins is currently in the custody of the California

Department of Corrections and Rehabilitation, incarcerated at the Pleasant Valley State Prison.

Respondent has answered, and Jenkins has replied.  Jenkins has requested an evidentiary hearing.

II.  BACKGROUND/PRIOR PROCEEDINGS

A Sacramento County Superior Court Jury found Jenkins guilty of oral copulation with a

minor (Cal. Penal Code § 288a(b)(1)), and three counts of engaging in sexual intercourse with a

minor (Cal. Penal Code § 261.5(a)).[1]  In a bifurcated trial, the trial court found that Jenkins had

suffered two prior "strikes" (Cal. Penal Code §§ 667(b)-(i), 1170.12).  In January 2006 the trial

court, declining Jenkins's request to strike one or both prior "strikes," sentenced Jenkins to an

indeterminate prison term of twenty-five years to life.  The California Court of Appeal affirmed

---

[1] The jury hung on a count of penetrating a minor with a foreign object (Cal. Penal Code § 289(h)), and the prosecution dismissed a count of sodomy with a minor (Cal. Penal Code § 286(b)(1)).

Jenkins's conviction and sentence in an unreported decision,[1] and the California Supreme Court denied review on July 23, 2008.  On January 16, 2009, Jenkins filed a petition for state habeas relief in the Sacramento County Superior Court, which was denied in an unreported reasoned decision.  The California Court of Appeal summarily denied Jenkins's request for habeas relief without opinion or citation to authority, and the California Supreme Court did likewise on November 10, 2010.  Jenkins timely filed his Petition for relief in this Court on January 25, 2011.

The California Court of Appeal summarized the facts underpinning Jenkins's conviction:

**The alleged crimes**

On January 24, 2004, in a "greenbelt" in a residential area of Citrus Heights, [Jenkins], aged 40, and E.C., a female aged 16, had sex for about two hours in full view of the neighbors.

P.T., who lived across from the greenbelt, heard a man's distinctive laugh. She recognized it from two months before, when she had seen the man, who was African-American, and a younger white female embracing and talking in the greenbelt for about an hour.

P.T. walked to the home of her neighbors, J. and M. G., and announced: "They're out there again."  The G.s directed P.T. to their front window, where she saw that the male, naked and kneeling over the female, was moving his buttocks up and down, apparently engaged in sexual intercourse.

After driving to the store, P.T. and J.G. returned to find the activity still going on.  Looking out again from inside the G. house, they saw the male performing oral sex on the female.  J.G. called the police.

J.G. recalled events generally the same way, though differing as to when they began and in which order they occurred.  M.G. recalled that beginning around 2:30 or 3:00 p.m., the male performed oral sex on the female for 15 or 20 minutes; he then got on top of her and engaged her in intercourse; they then switched positions and continued the intercourse.

D.B., another resident of the same street, also observed the couple at different times and eventually called the police.  When he called, the couple were having intercourse with the female atop the male.

Sacramento County Sheriff's Deputies Marc Warren and Mike Paredes, assigned to the Citrus Heights Police Department, arrived in response to the 911 calls at around 4:45 p.m.  Warren saw [Jenkins] kneeling, with his back to the officers, and "a white female subject on her hands and knees directly in front of him"; [Jenkins]

_____

[1] *People v. Jenkins*, No. C051852, 2008 WL 2030920 (Cal. Ct. App. May 13, 2008).

was "making a thrusting motion like he was having sex." On the ground were six empty beer cans and a sleeping bag.

As the officers neared, [Jenkins] and E.C. stopped what they were doing. [Jenkins] stood up and put on his sweat pants, through which his erection could be seen. E.C. put on her shirt, but not her panties.

**E.C.'s statement to Deputy Warren**

E.C. told Deputy Warren that she was 18 years old and was born in November 1984; he realized, however, that that birth date would make her 19. After Warren moved her away from [Jenkins], she admitted that her true birth year was 1987 and her true age was 16. Deputy Paredes took [Jenkins] into custody, while Warren handcuffed E.C., put her in the back of his patrol car, and took her to the police station for questioning.

At the station, Warren unhandcuffed and interviewed E.C. According to Warren, she was "calm" and "forthcoming," not nervous or uncomfortable. Two or three times, before the interview started and again toward the end, she asked to go to the bathroom, but he would not allow it; he finally told her that it was not possible because she would have to undergo an evidentiary examination after the interview. She never said that her need was so urgent she could not continue the interview.

E.C. said that she and [Jenkins] met a couple of months before, exchanged phone numbers and stayed in touch. (E.C.'s mother also knew [Jenkins], but E.C. did not know how.) E.C. had told him before January 24, 2004, that she was only 16 and "was having issues as far as whether they should remain in contact with each other due to the differences in their age." She feared that [Jenkins] might get into trouble on this account. She had lied about her age to Warren because she also feared getting into trouble. She and [Jenkins] had never had sex before.

On January 24, 2004, E.C. told her father, with whom she was staying, that she was going to a friend's house. Instead, by prearrangement, she met [Jenkins] at the greenbelt. He brought a sleeping bag and a six-pack of beer. She drank one beer; [Jenkins] had the rest. She did not appear inebriated to Warren.

As E.C. and [Jenkins] sat talking and drinking beer, they began "playing around." After playfully touching [Jenkins], she took off her pants and underwear and lay down. He began licking her vagina, then inserted his fingers into it. He continued these acts for 45 minutes.

After that, she and [Jenkins] had sex in the missionary position, with [Jenkins] on top. Then they switched positions and continued the intercourse. From there, they moved on to "the doggy style position." The officers arrived soon after.

**E.C.'s later statements and conduct**

*The evidentiary examination*

Deputy Paredes took E.C. to UC-Davis Medical Center for the evidentiary examination. However, she refused to permit it.

*The Linke interview*

In March 2004, Detective John Linke conducted a videotaped interview of E.C., which was played for the jury with a transcript. E.C. asked: "Is this something I have to do?" Told that she did not, she said: "Okay, well, I'm not trying to not do

it [*sic*] because I [*sic*] just sick of talking about it." She said over and over that she did not want to talk about the case, sometimes adding that she was sick of doing so or that it was stressful. Linke finally gave up and ended the interview.

*The preliminary hearing*

At the preliminary hearing in April 2004, E.C. testified in part: Before January 24, she had told [Jenkins] that she was 18, not 16; she did not remember telling Deputy Warren otherwise. On January 24, although she drank three beers (not one) with [Jenkins], they did nothing but kiss.[FN9] She had falsely told Warren a different story because "when they were questioning me I – I was really scared, and I wasn't really paying attention to what they were saying. I just kept thinking about other things like what my parents were going to say if they—if I got in trouble. I wasn't—when they asked me things I was just trying to answer it fast so I didn't have to sit there. Um, I was just—I was just answering yes or no, I didn't—I wasn't really paying attention to what I was saying."

*Trial*

Before trial, E.C. indicated that she would refuse to testify. Appearing in court and advised by counsel, she did not change her mind even after granted immunity and threatened with contempt. The trial court found her unavailable. Pursuant to the parties' stipulation, a redacted version of her preliminary hearing testimony was read into the record after Deputy Warren had testified about her statement to him.

**Other evidence**

E.C.'s mother testified that she had told [Jenkins] (whom she knew before E.C. did) that E.C. was 16.

**Defense case**

[Jenkins] did not testify. He called only one witness, his investigator.[2]

## II.  GROUNDS RAISED/DEFENSES

In his Petition Jenkins asserts two grounds. In his first ground Jenkins claims cumulative error and lists under it fourteen subgrounds. Jenkins also asserts that the denial of his requests for discovery, including his post-conviction requests, exacerbated the cumulative effect of the errors. The subgrounds raised are:  (1) ineffective assistance of trial counsel (failure to investigate); (2) a *Brady* violation[3] (failure to disclose the victim's clothing confiscated by the

---

[2] *Jenkins*, 2008 WL 2030920 at 1-4.

[3] *Brady v. Maryland*, 373 U.S. 83 (1962). A shorthand reference to the failure of the

(continued...)

police); (3) a *Giglio* violation[4] (failure to provide the "rap" sheet for the victim's mother); (4) an

improper withdrawal of a defense exhibit; (5) the denial of a free transcript of Jenkins's 1986

trial; (6) prosecutorial misconduct (use of perjured testimony of Detective Warren); (7) that an

outside influence tainted the jury; (8) the sentence was imposed on materially untrue assumptions

(e.g., an incorrect interpretation of the scope of the 1986 conviction and Jenkins's nonacceptance

of responsibility for it); (9) that he was denied the right to a fair opportunity to defend against the

State's accusations (related to his assertion that his 1986 conviction was erroneously interpreted);

(10) a *Blakely* violation[5] (in connection with the 1986 conviction); (11) breach of a prior plea

agreement; (12) his sentence was disproportionate to other sentences; (13) ineffective assistance

of trial counsel for failing to request a continuance to have the victim's clothing tested for DNA,

and to take proper corrective action in connection with subgrounds (2), (3), (4), (6), (7), and (8);

and (14) ineffective assistance of appellate counsel for failing to raise on appeal subgrounds (1)

through (10), (12), and (13).  Jenkins's second ground—six of the subgrounds raised in his first

ground—simply asserts that he has met the requirement that the state court decisions were

contrary to established federal law.  In his Attachment "B" entitled "Evidentiary Hearing

Requested," Jenkins asserts in conclusory terms that the trial court erred in:  (1) admitting the

testimony of Detective Linke concerning his failed interview of the victim; (2) summarily

---

[3](...continued)
prosecution to turn over exculpatory evidence.

   [4] *United States v. Giglio*, 405 U.S. 150 (1972).  A shorthand reference to the failure of the
prosecution to turn over witness impeachment material.

   [5] *Blakely v. Washington*, 542 U.S. 296 (2005).  A shorthand reference to a sentence
enhancement based upon findings by the court, not the jury.

denying his *Pitchess* motion;[6] (3) denying his *Romero* motion;[7] and (4) in admitting the coerced statement of the minor.

As relevant to the Petition before this Court, in his direct appeal, Jenkins contended that the trial court erred:  (1) in admitting a detective's (Linke) videotaped interview of the victim; (2) in admitting a detective's (Warren) testimony about the victim's unrecorded statement taken immediately after the incident; (3) in denying Jenkins's *pro se Pitchess* motion (the discovery claim); and (4) in refusing to strike the prior "strikes."  Respondent contends that except for the rejection of Jenkins's discovery (*Pitchess*) claim, the use of the Warren testimony, and the *Romero*-based claim to the extent those claims were raised on direct appeal, all other claims are procedurally barred.  Respondent asserts no other affirmative defenses.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[8]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

---

[6] *People v. Pitchess*, 522 P.2d 305 (1974).  A shorthand reference to the standards under California law for the discovery of evidence of police misconduct.

[7] *People v. Romero*, 917 P.2d 628 (Cal. 1996).  A shorthand reference to the procedure for challenging prior convictions as a "strike" for sentencing purposes under California law.

[8] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade*, 538 U.S. 63, 70-75 (2003) (explaining this standard).

time of the relevant state-court decision."[9]  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.[10]  Thus, where holdings of the Supreme Court

regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'"[11]  When a claim falls under the

"unreasonable application" prong, a state court's application of Supreme Court precedent must

be "objectively unreasonable," not just "incorrect or erroneous."[12]  The Supreme Court has made

clear that the objectively unreasonable standard is "a substantially higher threshold" than simply

believing that the state-court determination was incorrect.[13]  "[A]bsent a specific constitutional

violation, federal habeas corpus review of trial error is limited to whether the error 'so infected

the trial with unfairness as to make the resulting conviction a denial of due process.'"[14]  In a

federal habeas proceeding, the standard under which this Court must assess the prejudicial

impact of constitutional error in a state court criminal trial is whether the error had a substantial

---

[9] *Williams*, 529 U.S. at 412 (alteration added).

[10] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[11] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[12] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[13] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[14] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

and injurious effect or influence in determining the outcome.[15]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[16]

The Supreme Court recently underscored the magnitude of the deference required:

As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.* Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[17]

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[18]  State appellate court decisions that summarily affirm a lower court's opinion without

---

[15] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[16] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[17] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[18] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

explanation are presumed to have adopted the reasoning of the lower court.[19]  This Court gives

the presumed decision of the state court the same AEDPA deference that it would give a

reasoned decision of the state court.[20]

Under California's unique habeas procedure, a prisoner who is denied habeas relief in the

superior court files a new original petition for relief in the court of appeal.  If denied relief by the

court of appeal, the defendant has the option of either filing a new original petition for habeas

relief or a petition for review of the court of appeal's denial in the California Supreme Court.[21]

This is considered the functional equivalent of the appeal process.[22]  Under AEDPA, the state

court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption

by clear and convincing evidence.[23]  This presumption applies to state-trial courts and appellate

courts alike.[24]

---

[19] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[20] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[21] *See Carey v. Saffold*, 536 U.S. 214, 221-22 (2002) (citations omitted) (discussing California's "original writ" system).

[22] *See id.* at 222 ("Thus, typically a prisoner will seek habeas review in a lower court and later seek appellate review in a higher court . . . .").

[23] 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." (citing 28 U.S.C. § 2254(e)(1))).

[24] *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) ("Stevenson does not address these factual findings, let alone challenge them with clear and convincing evidence.

(continued...)

To the extent that Jenkins raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.[25]  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.[26]  "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[27]  A federal court errs if it interprets a state legal doctrine in a manner that directly conflicts with the state supreme court's interpretation of the law.[28]  A determination of state law by a state intermediate appellate court is also binding in a federal habeas action,[29] especially true where the highest court in the state has denied review of the lower court's decision.[30]

---

[24](...continued)
Accordingly, we presume them to be correct." (citing 28 U.S.C. § 2254(e)(1); *Pollard v. Galaza*, 290 F.3d 1030, 1035 (9th Cir. 2002))).

[25] *Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).

[26] *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (it is presumed that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *see also Engle v. Isaac*, 456 U.S. 107, 119 (1982) (challenging the correctness of the application of state law does not allege a deprivation of federal rights sufficient for habeas relief); *Bell v. Cone*, 543 U.S. 447, 455 (2005) (a federal court may not lightly presume that a state court failed to apply its own law).

[27] *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[28] *See Bradshaw*, 546 U.S. at 76-78 ("Because the Sixth Circuit disregarded the Ohio Supreme Court's authoritative interpretation of Ohio law, its ruling on sufficiency of the evidence was erroneous.").

[29] *See Hicks v. Feiock*, 485 U.S. 624, 629-30 & n.3 (1988) (noting state appellate court's determination of state law is binding and must be given deference).

[30] *Id.*; *see West*, 311 U.S. at 237 ("This is the more so where, as in this case, the highest
(continued...)

A petitioner may not transform a state-law issue into a federal one by simply asserting a violation of due process.[31]  "[The Supreme Court has] long recognized that a mere error of state law is not a denial of due process."[32]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[33]  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."[34]

## IV.  DISCUSSION

### A.      Evidentiary Hearing

Jenkins has requested an evidentiary hearing.  The Supreme Court made clear in *Pinholster* that "review under [28 U.S.C.]  § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."[35]  "Federal courts sitting in habeas are

---

[30](...continued)
court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court."); *Shannon v. Newland*, 410 F.3d 1083, 1087 (9th Cir. 2005) (same).

[31] *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996).

[32] *Cooke*,131 S. Ct. at 863 (internal quotation marks and citations omitted).

[33] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[34] *Smith v. Phillips*, 455 U.S. 209, 221 (1982) (citations omitted); *see Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) ("It is beyond dispute that we do not hold a supervisory power over the courts of the several States." (quoting *Dickerson v. United States*, 530 U.S. 428, 438 (2000))).

[35] *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011); *see Townsend v. Sain*, 372 U.S. 293, 312-13, 319 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *superceded in part by statute*, 28 U.S.C. 2254(e)(2) (1996).

not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings."[36]  "If the state-court decision 'identifies the correct governing legal principle' in effect at the time, a federal court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'"[37]  As the Supreme Court noted, "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court."[38]  Although under *Pinholster* an evidentiary hearing in a federal habeas proceeding is not absolutely precluded, *Pinholster* also made clear that the discretion to grant a request for an evidentiary hearing is cabined by § 2254(e)(2),[39] which provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
> (A) the claim relies on—
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

---

[36] *Williams*, 529 U.S. at 437 (quoted with approval in *Pinholster*, 131 S. Ct. at 1401); *see Richter*, 131 S. Ct. at 787 (noting that the basic structure of federal habeas jurisdiction is designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions); *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing.").

[37] *Pinholster*, 131 S.Ct. at 1399 (quoting *Williams*, 529 U.S. at 405).

[38] *Id.*

[39] *Id.* at 1400-01.

Jenkins's request in this case does not meet that standard.  Accordingly, Jenkins's request for an evidentiary hearing is **DENIED**.

**B.      Procedural Bar**

A federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a ground that is independent of the federal question and adequate to support the judgment."[40]  "The state-law claim may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits."[41]  Procedural default does not preclude federal habeas review unless the last state court rendering judgment in a case, clearly and expressly states that its judgment rests on a state procedural bar.[42]  "[I]n order to constitute adequate and independent grounds sufficient to support a finding of procedural default, a state rule must be clear, consistently applied, and well established at the time of the petitioner's purported default."[43]  A discretionary state procedural rule can be firmly established and regularly followed, so as to bar federal habeas review, even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others.[44]

To the extent Jenkins's claims were defaulted in state court on an adequate and independent state ground, they will not be considered in federal habeas proceedings unless

---

[40] *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

[41] *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011).

[42] *Teague v. Lane*, 489 U.S. 288, 298-99 (1989) (citing *Harris v. Reed*, 489 U.S. 255, 262-63 (1989)).

[43] *Morales v. Calderon,* 85 F.3d 1387, 1393 (9th Cir. 1996) (internal quotation marks and citation omitted).

[44]  *Martin*, 131 S. Ct. at 1128; *Beard v. Kindler*, 130 S. Ct. 612, 618 (2009).

Jenkins can demonstrate cause for the default and actual prejudice, i.e., a miscarriage of justice.[45]

To prove a fundamental miscarriage of justice, Jenkins must show that a constitutional violation

probably resulted in his conviction despite his actual innocence.[46]  Although at the gateway stage

Jenkins need not establish his innocence as an "absolute certainty," Jenkins must demonstrate

that more likely than not, no reasonable juror could find him guilty beyond a reasonable doubt.[47]

> If a petitioner has procedurally defaulted on a claim, a federal court may
> nonetheless consider the claim if he shows: (1) good cause for his failure to exhaust
> the claim; and (2) prejudice from the purported constitutional violation; or (3)
> demonstrates that not hearing the claim would result in a "fundamental miscarriage
> of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *Sawyer v. Whitley,* 505 U.S.
> 333, 339–40, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).  An objective factor outside
> of a petitioner's control (e.g., ineffective assistance of counsel or a basis for the claim
> that was previously unavailable) could constitute cause. *Murray v. Carrier,* 477 U.S.
> 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *McCleskey v. Zant,* 499 U.S. 467,
> 497, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).  The petitioner can meet the prejudice
> prong if he demonstrates "that the errors . . . worked to his *actual* and substantial
> disadvantage, infecting his entire [proceeding] with errors of constitutional
> dimension." *White v. Lewis,* 874 F.2d 599, 603 (9th Cir.1989) (citing *United States
> v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).  A petitioner
> can demonstrate a fundamental miscarriage of justice by "establish[ing] that under
> the probative evidence he has a colorable claim of factual innocence." *Sawyer,* 505
> U.S. at 339, 112 S.Ct. 2514 (quotation marks omitted).[48]

Analysis starts with the fact that with respect to each of his first thirteen subgrounds,

except his eleventh, Jenkins alleges that his appellate counsel was ineffective for failing to raise it

---

[45] *See Coleman,* 501 U.S. at 729.

[46] *See Schlup v. Delo,* 513 U.S. 298, 321-25 (1995) (linking miscarriages of justice to actual innocence); *United States v. Olano,* 507 U.S. 725, 736 (1993) ("In our collateral-review jurisprudence, the term 'miscarriage of justice' means that the defendant is actually innocent."); *Murray v. Carrier,* 477 U.S. 478, 496 (1986) ("[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.").

[47] *House v. Bell*, 547 U.S. 518, 538 (2006).

[48] *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011).

on direct appeal.  Analysis of an ineffective assistance of appellate counsel claim starts with the rule that the failure of appellate counsel to raise meritless or weak issues does not constitute ineffective assistance of counsel.[49]  Thus, in order to assess whether appellate counsel rendered constitutionally adequate representation this Court must determine whether or not the issue Jenkins claims appellate failed to raise was either meritless or weak.  Accordingly, unless there is some defense that precludes Jenkins from raising his ineffective assistance of appellate counsel claim on the merits, whether or not Jenkins is procedurally barred from bringing the underlying claim is irrelevant—while this court may not grant relief on the basis of the underlying ground itself, this Court must nonetheless review the merits of the underlying claim to determine if appellate counsel's representation was rendered ineffective by failing to raise it.  Respondent does not assert an affirmative defense to the ineffective assistance of appellate counsel claim.

This Court is left with solely the eleventh ground, breach of the plea agreement vulnerable to a procedural default test entirely precluding its review by this Court.  Jenkins raised this argument in his petition for habeas relief in the state courts.  The Sacramento County Superior Court denied Jenkins's relief on, *inter alia*, this ground, holding:

> A petition for writ of habeas corpus does not serve as a second or substitute appeal.  (*In re Harris* (1993) 5 Cal.4th 813.829.)  This bars the petition from raising matters that were, or could have been. raised and addressed on appeal.  (*Ibid.*)  When a petition raises an issue that was raised and rejected on direct appeal the claim is usually summarily denied  (*In re Waltreus* (1965) 62 Ca1.2d 218, 225), absent a showing there was a violation of "fundamental constitutional rights."  (*In re Norris* (1993) 5 Ca1.4th 813, 830.)  No such violation is alleged here.

---

[49] *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) (holding that appellate counsel does not have an obligation to raise every nonfrivolous argument); *Miller v. Keeney*, 882 F.2d 1428, 1428 (9th Cir. 1989) (holding that appellate counsel's failure to raise a weak issue did not constitute ineffective counsel).

> Because all of the above issues were either addressed in [Jenkins's] appeal, or could have been, they cannot now be raised anew by petition for writ of habeas corpus.[50]

It is firmly established under California law that "habeas corpus will not lie as a substitute for appeal . . . nor as a second appeal."[51]  Contentions that could have been raised during direct appeal, but were not, generally cannot be renewed in a habeas petition.[52]  Likewise, contentions that were raised and rejected on appeal cannot be raised again in a petition for habeas corpus.[53] That a rule precluding collateral review of issues that may be raised on direct review constitutes an adequate and independent state ground is settled.[54]  Jenkins makes no claim of actual innocence.  Indeed, as the Sacramento County Court noted in denying him habeas relief, the evidence of his guilt is overwhelming.[55]  Thus, review in this Court of the merits of Jenkins's eleventh subground is procedurally barred.[56]

### C.    Procedural Status

This Court's review of the merits of the claims raised in the Petition is made more difficult by the fact that neither the Sacramento County Superior Court nor the Respondent

---

[50] Docket No. 17 at 48-49.

[51] *In re Harris*, 855 P.2d 391, 396 (Cal. 1993) (citing *In re Foss*, 519 P.2d 1073 (Cal. 1974); (*In re Terry*, 484 P.2d 1375 (Cal. 1971); *In re Waltreus*, 397 P.3d 1001 (Cal. 1965); *In re Spears*, 204 Cal. Rptr. 333 (Cal. App. 1984); *In re Wagner*, 173 Cal. Rptr. 766 (Cal. App. 1981)).

[52] *Ex parte Dixon*, 264 P.2d 513, 514 (Cal. 1953).

[53] *In re Waltreus*, 397 P.2d 1001, 1005 (Cal. 1965) (citing *In re Winchester*, 348 P.2d 904, 907 (Cal. 1963)).

[54] *See Reed v. Ross*, 468 U.S. 1, 10-11 (1984) (applying an identical North Carolina rule).

[55] Docket No. 17 at 50.

[56] *Bennett v. Mueller*, 322 F.3d 573, 581-82 (9th Cir. 2003).

address the ineffective assistance of appellate counsel claims.  Likewise, except for the claims that were raised on direct appeal and, to a limited extent, the ineffective assistance of trial counsel claims in the state habeas proceeding, neither the state courts nor the Respondent address Jenkins's claims on the merits.

Review is further complicated by the fact that, in several instances, Jenkins presents his claims on different legal and factual bases in his Petition before this Court than he did before the state courts (to the extent he presented them to the state courts).  This Court may not consider claims that have not been fairly presented to the state courts.[57]  Exhaustion of state remedies requires the petitioner to fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights.[58]  A petitioner fairly presents a claim to the state court for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal bases for the claim.[59]  Although Respondent has not raised as a defense the failure to exhaust state court remedies,[60] neither has it been waived,[61] and in appropriate circumstances this Court may raise the issue *sua sponte*, provided nothing in the

---

[57] 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases).

[58] *Duncan v. Henry,* 513 U.S. 364, 365 (1995).

[59] *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009).

[60] 28 U.S.C. § 2254(b)(1); Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2012).

[61] 28 U.S.C. § 2254(b)(3) ("[A] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement, unless the State, through counsel, expressly waives the requirement.").

record suggests that the state either strategically withheld the defense or chose to relinquish it.[62]

Generally, a *habeas* court may, in its discretion, reach the merits of a *habeas* claim or may insist

on exhaustion of state remedies even where the State waives the defense.[63]  The court's

discretion should be exercised to further the interests of comity, federalism, and judicial

efficiency.[64]  This case presents a situation where it is appropriate to raise the failure to exhaust

available state court remedies *sua sponte*.  Therefore, this Court will limit the extent to which it

addresses the merits to those issues that were clearly and specifically properly raised in the state-

court proceedings both legally and factually.

     The fact that the state courts did not specifically address an issue does not preclude

review by this Court.  A state court is not required to give reasons before its decision can be

deemed to be "adjudicated on the merits."[65]  When there is no reasoned state court decision

denying an issue presented to the state court, "it may be presumed that the state court adjudicated

the claim on the merits in the absence of any indication or state-law procedural principles to the

contrary."[66]  "The presumption may be overcome when there is reason to think that some other

explanation for the state court's decision is more likely."[67]  Where the presumption applies, this

Court must perform an independent review of the record to ascertain whether the state court

---

[62] *See Day v. McDonough*, 547 U.S. 198, 206-11 (2006); *but see Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003) (a failure to raise an affirmative defense constitutes a waiver).

[63] *See Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1997).

[64] *See id.*

[65] *Richter*, 131 S. Ct. at 785.

[66] *Id.* at 784-85.

[67] *Id.* at 785.

decision was objectively unreasonable.[68]  In conducting an independent review of the record, this Court presumes that the relevant state-court decision rested on federal grounds,[69] giving that presumed decision the same deference as a reasoned decision.[70]  The scope of this review is for clear error of the state court ruling on the petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can view it through the "objectively reasonable" lens ground by *Williams*. . . . Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law.  Only by that examination may we determine whether the state court's decision was objectively reasonable.[71]

"[A]lthough we independently review the record, we still defer to the state court's ultimate decision."[72]

In this case, the Court is facing a somewhat unusual situation.  Three claims presented to this Court were presented in some form and addressed on the merits on direct appeal:  (1) denial

---

[68] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam).

[69] *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision."); *see also Harris*, 489 U.S. at 263.

[70] *Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[71] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (citation omitted). *But cf. Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) ("Our standard of review is not controlled by *Delgado v. Lewis* . . . There, we held that where a state court provides no rationale for a decision, a habeas court does not apply de novo review, but instead determines whether the state decision was objectively unreasonable based on its independent reading of the record.  Here, however, the state court was not silent as to its reasoning . . . .  Therefore, we review de novo whether Lewis waived his right to conflict free counsel . . . .").

[72] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

of the *Pitchess* motion; (2) admission of the testimony of Detective Warren; and (3) that trial counsel was ineffective for failing to object to the admission of the videotaped interview of the victim by Linke.  The underlying claim that the videotaped interview of the victim by Linke was erroneously admitted was denied on procedural grounds.  The remaining claims, to the extent that they were raised in the state courts, were raised in the state habeas proceedings.  The Sacramento County Superior Court denied relief on the claims, other than the ineffective assistance of counsel claims, entirely on procedural grounds, i.e., failure to raise on direct appeal.[73]  On the other hand, the ineffective assistance of trial counsel claims presented were denied partially on procedural grounds and, to some extent, on the merits.

To the extent that Jenkins presented his claims on direct appeal, other than the videotape of the Linke/victim interview, the California Court of Appeal clearly determined those claims on the merits, and they are entitled to AEDPA deference.  On the other hand, the ineffective assistance of appellate counsel claim was not specifically addressed by the Sacramento County Superior Court.  Because it is not clear that the California courts denied relief on procedural grounds, this Court must presume that the ineffective assistance of appellate counsel claim was denied on the merits applying federal grounds,[74] and give the presumed decision the same deference as a reasoned decision.[75]

---

[73] Docket No. 17 at 48-49.

[74] *See Coleman*, 501 U.S. at 740; *Harris*, 489 U.S. at 263.

[75] *Richter*, 131 S. Ct. at 784-85.

**D.      Merits**

In discussing the merits, this Court will discuss first those of Jenkins's claims that were raised on direct appeal and addressed by the California Court of Appeal, including the ineffective assistance of trial counsel claims, and the ineffective assistance of trial counsel claims raised in his state habeas proceeding.   The Court will then discuss the ineffective assistance of appellate counsel claim, including to the extent necessary, the otherwise procedurally barred underlying claims.

Denial of the *Pitchess* Motion

Jenkins contends that the trial court erroneously denied his *Pitchess* motion seeking discovery of the personnel records of various police officers.   The California Court of Appeal rejected Jenkins's arguments, holding:

> While representing himself before trial, [Jenkins] filed many motions.   Some asserted that the authorities, particularly law enforcement in the Citrus Heights area, had a longstanding vendetta against him because he was a Black man who had tried to better himself.
>
> In a *Pitchess* motion filed on October 19, 2004, which attached two declarations and a memorandum of points and authorities, [Jenkins] sought discovery of the personnel records of Deputy Warren, Deputy Paredes, Detective Linke, and other officers.   The first declaration stated that [Jenkins] believed this discovery would reveal evidence of the officers' racial and ethnic prejudice and related official misconduct, based on the racial profiling and abusive treatment to which he had long been subjected and had repeatedly filed complaints about.   The second declaration stated that, based in part on the arresting officers' lack of diligence in seeking eyewitnesses to the purported crimes, [Jenkins] believed the officers had used the present incident to retaliate against him for filing complaints.   To the memorandum of points and authorities, he attached a statement headed "Re: Deputy Warren's Political Viewpoint," which alleged that E.C.'s mother "recently stated to a mutual aquaintance [*sic*] that [D]eputy Warren, in a conversation with [E.C.'s mother or father], has stated that he . . . is an avowed White Supremacist."
>
> At a pretrial hearing on [Jenkins's] pro se motions, the trial court observed that identity did not appear to be an issue in the case.   The court reserved the *Pitchess* motion for the following week, when Sheriff's Department representatives could attend.

21

The Sheriff's Department filed opposition to the motion, asserting among other things that [Jenkins] had not shown good cause for discovery because he had not laid a plausible factual foundation to show that police misconduct could have anything to do with this case.

At the hearing on the motion, the trial court noted that it had read everything [Jenkins] filed in support of his motion, then ruled: "I agree with the papers filed by the Sheriff's Department. . . . I don't think you established sufficient grounds where I have to order in camera review, so I will deny your motion."

**Analysis**

[Jenkins] asserts that the trial court's "summary" denial of his motion was error. We are not persuaded. To show good cause for *Pitchess* discovery, a defendant must submit a declaration which establishes the materiality of the requested evidence by (1) proposing a defense or defenses to the charges, (2) articulating how the discovery sought may be admissible and relevant evidence or may lead to such evidence, (3) describing a plausible and factually specific scenario supporting the claim of officer misconduct, and (4) showing a logical connection between the claimed misconduct and the proposed defense or defenses. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1024-1027.) [Jenkins's] argument fails at the threshold because he does not cite or discuss the *Warrick* standard, nor make any showing that his motion met that standard. [Jenkins] had two possible defenses: to deny that he did the alleged acts, or to admit them but to claim the legal excuse that he reasonably believed E.C. was 18. He cites nothing in the record to explain how his motion and supporting declarations spelled out either defense or explained how the alleged police misconduct could be logically connected to either. Instead, he spends five pages of his opening brief ruminating about whether, as he alleged, Deputy Warren *might* be a racist and *might* have confided his views to E.C.'s parents. The question [Jenkins] does not attempt to answer is: even if all that were true, how could it matter? Since at least four eyewitnesses saw [Jenkins] engaging in the charged conduct long before Warren arrived, [Jenkins] could not seriously have asked the jury to find that Warren invented the charges or framed [Jenkins] for someone else's acts. Nor was Warren's alleged racism relevant to whether [Jenkins] reasonably believed in good faith that E.C. was 18.

[Jenkins] has shown no grounds for reversal on this issue.[76]

Similar to the California Court of Appeal, this Court does not understand how the evidence sought to be admitted under Jenkins's *Pitchess* motion is in any way relevant to the contested issues in this case. The Supreme Court has repetitively held that the Constitution permits judges "to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an

---

[76] *Jenkins*, 2008 WL 2030920 at *11-12.

undue risk of 'harassment, prejudice, [or] confusion of the issues.'"[77]  Because, at best, the

*Pitchess* evidence is marginally relevant to disputed issues, its exclusion in this case does not rise

to the level of an error of constitutional dimension cognizable in this Court.[78]  Jenkins is not

entitled to relief on the basis that the trial court denied his *Pitchess* motion.

<u>Warren Testimony</u>

In his Petition before this Court, Jenkins alleges that the statements allegedly made by the

victim as testified to by Warren were the product of coercion, and should have been excluded.

On direct appeal Jenkins contended that admission of Detective Warren's testimony violated the

Confrontation Clause and that the victim's statement was coerced.[79]  The Court of Appeal

rejected Jenkins's coercion claim:

> *Coercion*
> [Jenkins] asserts that the trial court's ruling on this issue was erroneous.  We
> disagree.  A defendant has standing to assert that the prosecution violated his due
> process right to a fair trial by using a coerced third-party statement against him.
> (*People v. Jenkins* (2000) 22 Cal.4th 900, 966; *People v. Badgett* (1995) 10 Cal.4th
> 330, 344, 347-348; *People v. Lee* (2002) 95 Cal.App.4th 772, 781.)  [Jenkins] bears
> the burden of proving that the statement was involuntarily obtained.  (*People v.
> Douglas* (1990) 50 Cal.3d 468, 500.)
> Where the evidence surrounding the alleged coercion conflicts, we must
> accept the version most favorable to the People, to the extent supported by the record;
> however, if the facts are not in dispute, we review the record de novo to determine,
> based on the totality of circumstances, whether the statement was voluntary.  (*People
> v. Badgett, supra,* 10 Cal.4th at pp. 352-354; *People v. Anderson* (1990) 52 Cal.3d

---

[77] *Crane v. Kentucky*, 476 U.S. 683, 689-690 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)) (ellipsis and brackets in original); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

[78] *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) ("'Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'") (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982))).

[79] Jenkins does not raise his Confrontation Clause claim in this Petition before this Court.

453, 470; *People v. Lee, supra,* 95 Cal.App.4th at p. 781.)  We consider both the characteristics of the witness and the details of the encounter.  (See *People v. Neal* (2003) 31 Cal .4th 63, 80.)

[Jenkins] begins with a footnote insinuating that Deputy Warren fabricated E.C.'s statement and that his "general veracity," which trial counsel attacked, is in question.  Appellate arguments require headings or subheadings and may not be raised in footnotes.  (Cal. Rules of Court, rule 8.204(a)(1)(B).)  We therefore disregard this point.

Conceding Warren's credibility for argument's sake, however, [Jenkins] asserts that E.C.'s statement was involuntary because:  (1) She was 16 years old. (2) "She had been embarrassed by being interrupted during sexual intercourse, and had been approached by officers while nude from the waist down."  (3)  Warren waited only until she put her pants back on, then immediately questioned her as to her age, then, "upon finding her answer unsatisfactory, had taken her aside and questioned her again[.]"  (4) He then patted her down, handcuffed her "and put her in the back of his caged squad car . . . all in public, though the experience would have been plenty frightening and humiliating in private, as well[.]"  (5) He drove her to the station in handcuffs and removed her from his patrol car still in handcuffs.  (6)  He interrogated her " *not* in a room designed for interrogations, which again would have been plenty daunting, but instead in the evidence room[.]"  (7) Although he admitted in court that she was not free to leave, he did not give her *Miranda* advisements or any others as to her rights, did not contact her parents, and did not offer to let her do so—"a fairly thorough evisceration of her rights, and a pellucid indication of the bad faith in which he acted on the night in question[.]"  (8) "*The most important factor of all*:  Although the minor summoned the courage, or desperation, to tell Warren 'two or three times' during the interrogation that she needed to use a restroom, he ignored those requests/entreaties and told her that she must not urinate because she was going to take a medical examination—even though it was up to her, not him, whether she took that examination [.]"  (9) As soon as she escaped from him, she told his partner that she would not take the examination.  We are not persuaded.

First, "[t]he bulk of the legal authority relied on by [[Jenkins]] is the opinion of [his] counsel, an opinion often unsupported by citation to any recognized legal authority."  (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979.)  [Jenkins] cites only his counsel's opinion for the proposition that any or all of the above circumstances point to coercion.  Although "totality of the circumstances" review is necessarily fact-based, [Jenkins] asserts at least one proposition which requires authority:  that Deputy Warren had, and should have realized that he had, a legal obligation to advise E.C. pursuant to *Miranda* (or its juvenile-law statutory counterpart, Welfare and Institutions Code section 625), even though he considered her a victim undergoing an investigative detention, not a crime suspect under arrest. [Jenkins's] failure to cite authority forfeits this claim.  (*Kim v. Sumitomo Bank, supra,* 17 Cal.App.4th at p. 979.)

Second, [Jenkins's] vivid rhetoric depends almost entirely on speculation. [Jenkins] surmises that E.C.'s supposed embarrassment, fright, and humiliation

overbore her will, but cites no evidence before the trial court at the section 402 hearing that she felt these emotions during the interview.  He also ignores both Deputy Warren's contrary testimony and the trial court's assessment of E.C.'s willpower based on direct observation.

Third, as to what [Jenkins] calls "*[t]he most important factor of all,*" E.C.'s requests to use the bathroom, [Jenkins] simply indulges in more speculation.  He cites no evidence and ignores Warren's testimony that E.C. showed no sign of an urgent need to urinate.  Instead, [Jenkins] discourses on the diuretic properties of beer.  However, absent evidence that it had this effect on E.C., for us to conclude that it did would be ultracrepidarian.  [Jenkins] also fails to show why we should not accept Warren's explanation (as the trial court impliedly did) that it is standard and appropriate departmental policy to refuse bathroom visits to persons awaiting evidentiary examinations in sex-crime cases, in order to preserve evidence.

Fourth, as already noted (see fn. 15, *ante* ), no evidence supports [Jenkins's] assertion that as soon as E.C. had gotten away from Deputy Warren she told his partner that she would refuse the evidentiary examination.  But even if the evidence showed that she said this then rather than later, this fact would not tend to show that her statement to Warren was involuntary.

Having reviewed the record independently, we agree with the trial court that E.C.'s statement to Deputy Warren was voluntary.  Thus its substance was properly admitted through Warren's testimony.[80]

First, as Respondent notes, it is questionable whether Jenkins has raised a question of constitutional dimension.  Jenkins clearly has not raised a self-incrimination claim under the Fifth Amendment.[81]  As an evidentiary claim, it is subject to the Supreme Court's "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."[82]  In general, the admission of evidence "does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of

---

[80] *Jenkins*, 2008 WL 2030920 at *9-11.

[81] *See Couch v. United States*, 409 U.S. 322, 328-29 (1973) (holding that the Fifth Amendment is a personal privilege, adhering to the accused, not a third party).

[82] *Crane*, 476 U.S. at 689.

25

justice."[83]  "[T]he Due Process Clause does not permit the federal courts to engage in a finely

tuned review of the wisdom of state evidentiary rules."[84]  While there is authority for the

proposition that a defendant's Sixth Amendment right to compulsory process may be violated

when the prosecution's coercive actions cause a witness to *decline* to testify,[85] there is no

correlative federally recognized constitutional right to coercively compelling a witness to testify.

Indeed, quite to the contrary, witnesses are frequently "coerced" into giving testimony under

threat of jail for contempt if they do not.  Having failed to raise a claim of constitutional

dimension, Jenkins is not entitled to relief under his claim that the victim was coerced into

making a statement.

    *Romero* Claims

         In his eighth subground, Jenkins raises numerous allegations attacking the use of his prior

(1986) conviction as a "strike" in enhancing his sentence under California's "three-strikes" law.

In his fifth subground Jenkins contends that the trial court erroneously denied his request for the

transcripts of his 1986 trial.  In his ninth subground Jenkins essentially repeats parts of his fifth

subground.  In Attachment "B" to his Petition before this Court, Jenkins contends that the trial

court committed numerous factual errors in denying his *Romero* motion, but does not identify

those errors.  The California Court of Appeal rejected all of Jenkins's arguments:

         After the verdict, [Jenkins's] latest counsel filed a request that the trial court
         exercise its sentencing discretion under section 1385 and *Romero, supra,* 13 Cal.4th

---

[83] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998).

[84] *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)).

[85] *See, e.g., Webb v. Texas*, 409 U.S. 95, 97-98 (1998) (per curiam); *United States v. Jaeger*, 538 F.3d 1227, 1221 (9th Cir. 2008).

497, to strike one or both of [Jenkins's] strikes. The trial court ultimately denied the request. [Jenkins] contends this ruling was an abuse of discretion. We disagree.

**[Jenkins's] request**

Counsel argued: (1) The strikes were remote in time (1986), occurred in a short period when [Jenkins] was around 20 years old, and arose out of a single episode involving a breakup with a girlfriend; before he committed the second offense, probation had been recommended for the first. (2) Aside from alcohol-related misdemeanors, he had committed no further offenses. (3) The present offenses did not involve force or the threat of force. (4) During and after his incarceration, [Jenkins] obtained education and vocational skills, then held down a variety of jobs. (5) Two mental health experts appointed by the court agreed that [Jenkins] suffered from emotional disorders, but was not likely to reoffend.

The motion attached [Jenkins's] resume and the reports of psychiatrist Charles Schaffer and psychologist Janice Nakagawa.

**The People's opposition**

The People opposed [Jenkins's] request. They described [Jenkins's] two strikes and his underlying conduct as follows:

1. On New Year's Day, 1986, after having kidnapped his ex-girlfriend and forced her to stay outside with him all night long, he returned to her home, tried to kidnap her again, held a knife to her throat, dragged her into the parking lot, knocked her down, and attacked an onlooker who had been trying to stop him from driving away with her, repeatedly stabbing the victim in the back while saying, "I love to kill white boys." [Jenkins] pled guilty to violating sections 207 (kidnapping) and 245, subdivision (a)(1) (assault with a deadly weapon, causing great bodily injury).

2. On July 11, 1986, while awaiting sentencing on the prior charges, [Jenkins] went to his exgirlfriend's workplace, raped her, and kidnapped her again. [Jenkins] pled guilty to kidnapping. At that time he was sentenced to a total state prison term of six years for all the offenses together.

The People also noted that [Jenkins's] postincarceration record included violations of Vehicle Code section 23152, subdivisions (a) and (b), in 1991 and 1996.

The People argued that [Jenkins's] priors, though old, were extremely violent; he had not led a blameless life since his release from prison; there was no evidence that he had a stable living situation or a history of lawful employment for any significant period of time; and he had "no prospects for the future except more criminal activity[.]"

**The hearing on the motion and the trial court's ruling**

*The trial courts' initial remarks*

Before hearing argument, the trial court set out its "introductory thoughts" as follows:

[Jenkins's] priors, though old, were "very serious"; however, the current offense was nonviolent and "largely" consensual. Under *Romero* and *People v. Williams* (1998) 17 Cal.4th 148 (*Williams*), the court could strike one or more strikes only if it found that [Jenkins] was outside the spirit of the Three Strikes law. The

27

"checklist" of *Romero* and *Williams* factors (*Williams, supra,* 17 Cal.4th at p. 161) contained items that pointed both ways.

As to the remoteness of the priors, they occurred 18 years ago and [Jenkins] was discharged from parole 11 years ago.

As to intervening conduct, [Jenkins] had sustained convictions for driving under the influence, but not for crimes of violence. He also had an outstanding arrest warrant in Santa Clara County at the time of the present crimes.

As to the nature of the priors, their life-threatening violence was very troubling. So was the fact that [Jenkins] still minimized their seriousness when talking to the court-appointed experts.

As to whether they constituted a single act or a single instance of aberrant behavior, they did not arise out of the same act or transaction, but they occurred in a comparatively short time and involved the same victim.

As to the length of [Jenkins's] record, [Jenkins] did not appear to be the sort of "revolving-door criminal" described in many Three Strikes cases.

As to [Jenkins's] age, the fact that he was of mature years did not count in his favor if he had not "added any maturity with his age."

As to the nature of the present offense, though consensual and nonviolent, it involved "a 40-year-old man having sex with a 16-year-old girl after he has given her alcohol." He had previously had a confrontation with the girl's father, who told him to stay away from her. The outstanding Santa Clara County warrant, on which he had failed to appear, charged him with drinking in a park or public place. He had been arrested in Sacramento County on the warrant and had spent the night in jail. Immediately on release, he obtained beer and a sleeping bag and went to meet the minor in a park or public place.

As to rehabilitation, [Jenkins] had obtained education and vocational training, he was above average in intelligence, and both experts had found him unlikely to repeat sexual offenses with minors. On the other hand, the longest he had held a job was "about three and a half or four years," and at the time of the present crimes he was "a 40-year-old man living unemployed with his parents."

*Defense counsel's argument*

In addition to the points already raised, counsel asserted:

[Jenkins] had always been trouble-free in custody.

When [Jenkins] pled to his prior felonies, they were treated as a single case. As to the first strike, the probation report noted that [Jenkins] may not have caused the injury to his ex-girlfriend and may have felt that he was acting in self-defense; as to the second strike, the original rape charge was dismissed. If the Three Strikes law had existed then, his counsel probably could have plea-bargained around it, especially since [Jenkins] was a first-time offender.

[Jenkins's] current offense would not even be a crime in many states. And so far as the law is meant to protect minors from themselves, the minor in this case, judging by her prior testimony and her courtroom demeanor, did not need such protection.

28

[Jenkins] has strong family support.  He and his mother speak almost every day, and his brother had come to court on his behalf.

Not only did the experts say that [Jenkins] was unlikely to re-offend and could benefit from counseling, but [Jenkins] had established a rapport with Dr. Schaffer and would like to continue seeing him.  This would give the court a way of monitoring his progress and keeping him in line.

*The court's further observations*

The court took issue with counsel's remarks about the present crime.  This was not a case of a 19-year-old having sex with a 16-year-old: "This is a 40-year-old man who gets out of jail the night before for drinking in the park or arrested on a warrant outstanding for drinking in a park, gets a six-pack and a sleeping bag and takes the 16-year-old to this wooded area."  Furthermore, that the minor had a strong will did not show that she had mature judgment.

The court also stated: "If I were writing on a blank slate, your arguments would be much more compelling.  But I'm dealing with the law that the voters and the Legislature have given me.  I'm looking for the extraordinary factor, the extraordinary circumstances that take[ ] us out of the three strikes scheme.  To argue that a three strikes sentence is draconian is to state—that's the point of three strikes."  The court remained troubled, however, by the fact that [Jenkins] did not fit the usual "revolving door" profile of Three Strikes offenders.

*The prosecutor's argument*

The prosecutor conceded that this was "a difficult case," but asserted that [Jenkins's] history and current offense did not take him outside the spirit of Three Strikes.  Among other things, in connection with the second strike he had raped the victim twice, although "good lawyering skills" got the charges dropped.

As to [Jenkins's] history and character since his release, his pro se pleadings alleged that the police were always contacting him, which does not happen to "[n]ormal people" but only to "[p]eople who create problems."  At times he had been "semi homeless" and had the habit of drinking in parks.  Even when he was working, he "has an almost impossible time keeping a job"; he had had around 20 jobs, "and it's always somebody else's fault he lost it."  He believed that he had never done much wrong, yet the whole world was out to get him.  He accepted no responsibility for his acts.  All this showed that he lacks good character.  These facts, combined with the exploitative nature of the present crimes and his failure to recognize how he had damaged the victim, showed that his prospects were poor.

As to the experts' reports, both "severely understate any mental conditions [defendant] has.  [¶]  I mean, you can read the hundreds of pages of pro per papers, and it doesn't take a genius to figure out something is very wrong with [[Jenkins]] psychologically.  He believes that the Government has gone into his house and taken his computer and replaced it with an exact replacement with the exact same information on it for purposes of monitoring his conduct and behavior.  He believes multiple telephone companies have conspired with the Government to tap his phones and to interrupt his telephone calls.  [¶]  He believes that the Government has sent to him what he calls, and I quote, intimate informants.  Those people the Government

sends to him to gain his trust and confidence and have sexual intercourse with him, so he, in turn, opens up to them, and they go back to the Government and inform on him." Because the experts minimized [Jenkins's] disturbance, their predictions that he was unlikely to reoffend could not be relied on.

*Defense counsel's rebuttal*

Counsel replied: Unlike the prosecutor, the court-appointed evaluators were experts and their opinions deserved credence.

There was no evidence that [Jenkins] realized he was a third-striker when he committed the present crimes; in his mind, he had been convicted of one case and sent to prison on concurrent sentences. As to that case, the allegation that he talked about killing white boys was never tested in court, and [Jenkins] denied it. The probation department, not [Jenkins], suggested that he might have thought he was acting in self-defense. There was no rape conviction because there was no rape.

As to [Jenkins's] later history and character, he often changed jobs because short-term contract positions were the norm in his field. It was not surprising that the police might often contact a Black person living in certain neighborhoods, and this did not show [Jenkins] to be a revolving-door offender. If there were concerns about his mental state, that was all the more reason to treat him rather than to "warehouse" him in prison for life.

[*Jenkins's*] *remarks*

[Jenkins] addressed the court, saying that he was close to finishing his associate of arts degree, had already graduated from Heald Technical College, and intended to reenter the high-tech field after further "refresher" training.

*The court's ruling*

The court ruled as follows:

"I am not going to exercise my discretion to strike the strike. I don't come to this decision lightly. I've given it a lot of thought. And were I to decide what I thought was the appropriate punishment for [[Jenkins]]'s current conduct, it might be different, but I'm not writing on a blank slate. "The Court of Appeal in the McGlothin case[,] 67 Cal.App.4th 468, [h]as characterized . . . the Romero motion in the dismissing of a strike in the interest of justice as, quote, an extraordinary exercise of discretion, closed quote, similar to set[ting] asid[e] a judgment after conviction.

"And, in my mind, the most compelling factor[ ] in my analysis is of the seriousness of the prior conviction. Weighing on the other side of that argument for striking the strike would be the prolonged period of time without a serious or a violent offense, but we have then this current offense, which . . . I think is more serious than the defense has argued, and I'm particularly troubled by [Jenkins's] denial of any culpability in the current event and also his minimizing the prior event. "Again, he denies that there was any criminal conduct in this instance. The four residents across the street are lying. The officer who came upon him in the act—literally—was lying. And that the victim's father opposed their relationship because the victim's father was motivated by race rather than concern that his daughter was being involved with a 40-year-old man. It just strikes me that that's

further evidence of what the doctors have viewed as an antisocial personality that just minimizes his conduct.

"And so for those reasons I do not find extraordinary circumstances that, I think, I'm required to find to take [Jenkins] outside of the three strikes scheme. That doesn't mean I'm comfortable with my decision by any means. But I am guided by the court's language in McGlothin. In fact, I'm just going to read it from 67 Cal.App.4th 468 at 476.

"The Third DCA, our Court of Appeal, says [']in a democracy, the scope of a judge's authority is encompassed by the judgment of the citizens who bestow on the judiciary its authority in the first instance. Under our statutory framework, judges are not empowered to fashion any sentence they choose. The Legislature has created a sentencing structure within which every court must operate.

"[']Both the Legislature and the People, by initiative, have adopted a particular sentencing scheme for repeat offenders. A Court may not simply substitute its own opinion of what would be a better policy, or a more appropriately calibrated system of punishment, in place of that articulated by the People from whom the court's authority flows.['] Close quote.

"And, Mr. Bowman, I think that's really what you're asking, do I think it's appropriate[ ] to warehouse [[Jenkins]] by what you call a death sentence for this current offense is not really the choice before me. The voters and the Legislature have laid out sentencing schemes.

"And unless I find some very extraordinary circumstances that take [[Jenkins]] outside of that sentencing scheme, under the law, he faces the sentencing impos[ition] of that scheme. And I just don't find extraordinary circumstance [s] that I think would justify the exceptional relief of granting of [the striking of] a strike in this case.

"So for those reasons I'm denying the request that I exercise my discretion to strike either of the two strikes in this case."

**Analysis**

Our Supreme Court has recently clarified the standard of review for a claim that the trial court abused its discretion under section 1385 by refusing to strike a strike. (*People v. Carmony* (2004) 33 Cal.4th 367, 376-380 (*Carmony* ).) As will appear, [Jenkins] cannot show an abuse of discretion under the *Carmony* standard. *Carmony*

"In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." '[Citations.] Second, a '"decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'" '[Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that

no reasonable person could agree with it." (*Carmony, supra,* 33 Cal.4th at pp. 376-377.)

"Because 'all discretionary authority is contextual' [citation], we cannot determine whether a trial court has acted irrationally or arbitrarily in refusing to strike a prior conviction allegation without considering the legal principles and policies that should have guided the court's actions.  We therefore begin by examining the three strikes law." (*Carmony, supra,* 33 Cal.4th at p. 377.)

"'[T]he Three Strikes initiative, as well as the legislative act embodying its terms, was intended to restrict courts' discretion in sentencing repeat offenders.' [Citation.]  To achieve this end, 'the Three Strikes law does not offer a discretionary sentencing choice, as do other sentencing laws, but establishes a sentencing requirement to be applied in every case where defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme."' [Citation.]" (*Carmony, supra,* 33 Cal.4th at p. 377.)

"Consistent with the language of and the legislative intent behind the three strikes law, we have established stringent standards that sentencing courts must follow in order to find such an exception.  '[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, "'in furtherance of justice'" pursuant to [ ] section 1385[ ], or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.'" (*Williams, supra,* 17 Cal.4th at p. 161.)" (*Carmony, supra,* 33 Cal.4th at p. 377.)

"Thus, the three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so.  In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Carmony, supra,* 33 Cal.4th at p. 378.)

"*In light of this presumption, a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances.  For example, an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss* [*citation* ], *or where the court considered impermissible factors in declining to dismiss* [*citation* ].  *Moreover, 'the sentencing norms* [*established by the Three Strikes law may, as a matter of law,' produce* [ ] *an "'arbitrary, capricious or patently absurd'" result' under the specific facts of a particular case.* [*Citation.*]" (*Carmony, supra,* 33 Cal.4th at p. 378; italics added.)

"But '[i]t is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations.  [Citation.]  Where the record is silent [citation], or '[w]here the record demonstrates that the trial court

balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance' [citation].   Because the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary.   Of course, in such an extraordinary case-where the relevant factors described in *Williams, supra,* 17 Cal.4th 148, manifestly support the striking of a prior conviction and no reasonable minds would differ—the failure to strike would constitute an abuse of discretion." (*Carmony, supra,* 33 Cal.4th at p. 378.)

*Application*

The trial court showed at the start that it understood its discretion under Three Strikes by reciting the "checklist" of factors from *Williams, supra,* 17 Cal.4th 148, in which our Supreme Court defined the scope of a trial court's discretion to strike a strike, and observing that these factors pointed both ways in [Jenkins's] case.   The court also noted correctly that even if [Jenkins] is not the "revolving door" career criminal typically encountered in Three Strikes cases, this does not take him outside the law's reach:   anyone with at least one strike is presumed to fall within the spirit of the law unless he shows otherwise.   (*Carmony, supra,* 33 Cal.4th at p. 377.) During its colloquy with counsel, the court continued to balance the *Williams* factors, weighing the gravity of [Jenkins's] prior offenses and his present offense against his relatively crime-free interim history and his efforts at self-improvement.   Finally, the court made clear that it was not merely [Jenkins's] crimes but his self-perception as a blameless victim and his utter failure to admit to or take responsibility for his acts, indicating that his character and prospects for future change were poor, which decisively brought him within the spirit of Three Strikes.   This reasoning process was an exemplary exercise of discretion.

[Jenkins] asserts to the contrary that the trial court abused its discretion by basing its decision on legal and factual errors.   He claims that the court erred legally by (1) improperly considering the dismissed 1986 rape charge, (2) relying on an "'extraordinariness' standard" applicable only to career criminals, and (3) overlooking a relevant mitigating factor, [Jenkins's] mental disturbance.   He further claims that the court erred factually by (1) mischaracterizing the present offenses, (2) mischaracterizing [Jenkins's] work history, (3) failing to grasp the meaning of Dr. Schaffer's report, and (4) declaring without expertise or factual foundation that [Jenkins] exhibits " antisocial personality disorder ."   We are not persuaded.

"*Legal errors* "

[Jenkins's] only "evidence" that the trial court considered the dismissed rape charge is that the court at the outset called the prior strikes "two very serious convictions as detailed extensively in the People's opposition" (which, as discussed above, mentioned the alleged rape), then noncommittally "noted" counsels' arguments about it—including defense counsel's vehement assertion that it could not

be considered.  [Jenkins] does not cite any statement by the court affirmatively showing that it considered this charge.  Instead, he merely asserts that it is "manifest" the court did so.  [Jenkins's] argument is groundless.

[Jenkins's] claim that the court wrongly used an "'extraordinariness' standard" is a quibble.  He notes that this court applied an "extraordinary circumstances" test to decide whether a career criminal fell outside the spirit of the Three Strikes law.  (*People v. Strong* (2001) 87 Cal.App.4th 328, 332 (*Strong* ), quoted in *Carmony, supra,* 33 Cal.4th at p. 378.)  He then concludes that because he is not a career criminal, the court's use of this language shows it misapprehended the standard applicable to him.  His conclusion is unsupported.  First, *Strong* and *Carmony* had no occasion to consider whether the "extraordinary circumstances" test would apply to persons other than career criminals, because the issue was not presented in either case.  (*Carmony, supra,* 33 Cal.4th at pp. 378-380; *Strong, supra,* 87 Cal.App.4th at pp. 331, 338-340; cf. *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2.)  Second, to say that only "extraordinary circumstances" justify striking a strike amounts to the same thing as to say that a three-strike defendant is presumed to fall within the spirit of the law:  where that presumption exists, refusing to strike a strike is the ordinary result, and striking one or more is the extraordinary result.  The trial court's careful balancing of the *Williams* factors showed that it understood the test applicable to [Jenkins].

[Jenkins's] claim that the court failed to consider his mental illness as a mitigating factor depends on a misunderstanding of the applicable law.  He cites rule 4.423(b)(2) of the California Rules of Court, which allows a trial court to consider as a "circumstance in mitigation" that "[t]he defendant was suffering from a mental or physical condition *that significantly reduced culpability for the crime* [.]"  (Italics added.)  However, he does not explain how his mental condition reduced his culpability for the present crimes.  He also does not cite any authority holding that this factor, even if found to exist at the present time, suffices to take a defendant outside the spirit of Three Strikes.  The court was well aware of [Jenkins's] mental problems, having read the experts' reports and heard counsels' arguments about them.  The court simply did not find that these problems justified striking a strike.  "*Factual errors* "

[Jenkins's] claim that the court mischaracterized his present offenses is not well taken.  He objects to the court's statement that he "ha[d] sex with a 16-year-old juvenile after he ha[d] given her alcohol," pointing out that the victim told Deputy Warren she had drunk only one beer.  We are unable to grasp how the victim's statement, even if credible (at the preliminary hearing she claimed she had drunk three beers), renders the court's statement false.  [Jenkins] does not and cannot dispute that he brought beer to the greenbelt and gave it to the victim.

[Jenkins's] claim that the court misstated his work history and present living circumstances is no more persuasive.  He admits the facts found by the court—that he had never held a long term job, and that he was presently unemployed and living with his parents—but claims that his lack of advanced degrees and his two-strike stigma mitigate those facts.  The court's comment, whose factual accuracy [Jenkins]

concedes, was part of a total assessment of [Jenkins's] history, circumstances, and prospects.  [Jenkins] has not shown that the court abused its discretion in making that assessment.

[Jenkins's] claim that the court misread or misrepresented Dr. Schaffer's opinion amounts to much ado about nothing.  [Jenkins] asserts that the court "quoted only a very small portion of the primary conclusion" of Dr. Schaffer's report, namely that [Jenkins] has "a history of dysfunctional maladaptive behavior."  [Jenkins] then quotes Dr. Schaffer's findings of a "psychiatric disorder characterized by paranoid ideation " with "possible diagnoses" of "[b]ipolar [d]isorder," "[d]elusional [d]isorder," or "[p]sychotic [d]isorder, [n]ot [o]therwise [s]pecified," and additional possibilities of "[a]lcohol [a]buse [d]isorder" and "[p]ersonality [d]isorder, [n]ot [o]therwise [s]pecified."  After discoursing on where these "possible" diagnoses fit on Axes I and II of DSMIV, [Jenkins] concludes that because the court did not mention all of these findings, it failed to realize how gravely impaired Dr. Schaffer found [Jenkins] to be.  However, even if the court had accepted all of Dr. Schaffer's diagnoses—though Dr. Schaffer offered them only as "possible"—the court was not required to conclude that they put [Jenkins] outside the spirit of Three Strikes.  If [Jenkins's] mental condition, whatever it might be, had already led him to commit at least three felonies, including two strikes, and was likely to cause him to commit more offenses in the future, then it put him squarely within the law's scope.

Finally, [Jenkins's] claim that the court improperly diagnosed him as suffering from "antisocial personality disorder" is unpersuasive for the same reasons as his previous claim.  Whether or not the court used the term precisely as the experts or DSM-IV might use it, the court based its observation in part on [Jenkins's] adamant denial of culpability and insistence that all the witnesses against him were lying.  Those facts, which [Jenkins] does not dispute, give weight to the court's finding that [Jenkins's] character and future prospects were poor.  If [Jenkins] persists in believing or claiming to believe that everyone but himself is at fault for whatever he does, it is likely that he will continue to offend in the future if allowed to remain at large.

[Jenkins] has failed to show any abuse of discretion in the trial court's sentence.[86]

Jenkins's arguments related to the application of the "three strikes" to him fails on two

grounds.  First, the construction, interpretation, and application of the California "three-strikes"

law is one of state law, beyond the purview of this Court in a federal habeas proceeding.[87]

---

[86] *Jenkins*, 2008 WL 2030920 at *13-22.

[87] *Cooke*, 131 S. Ct. at 863 (holding that it is of no federal concern whether state law was

(continued...)

Second, as the California Court of Appeal noted, striking of a prior "strike" is within the discretion of the trial court.  Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation,[88] the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.  Indeed, quite to the contrary, the Supreme Court has suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.[89]

To the extent that Jenkins argues that the trial court relied upon incorrect or false evidence in imposing sentence under the "three strikes" law, that argument also fails.  The California Court of Appeal found that his "factual" claims were not borne out by the record.  This finding is presumptively correct,[90] and may not be overturned in the absence of clear and convincing evidence.[91]

Finally, to the extent that Jenkins argues that the imposition of his sentence under the "three strikes" law was based upon the findings by the court and not the jury in violation of *Apprendi*,[92] that argument is also rejected.  *Apprendi* held that: "*Other than the fact of a prior*

---

[87](...continued)
correctly applied).

[88] *See Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc).

[89] *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law. § 2254(d)(1).").

[90] *Sumner v. Mata*, 455 U.S. 591, 592-93 (1982) (per curiam).

[91] 28 U.S.C. § 2254(e)(1).

[92] *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

*conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[93]

Jenkins is not entitled to relief under any of the arguments he advances that the application of California's "three strikes" law to him in this case constituted an error of constitutional dimension.

Ineffective Assistance of Trial Counsel

*Claims Presented to the California Court of Appeal*

The California Court of Appeal of Appeal rejected the claim that trial counsel was ineffective in failing to object to the admission of the videotaped interview of the victim by Detective Linke, holding:

> Assuming for the sake of argument it was error to admit the Linke interview, defendant has not made out a case of ineffective assistance of counsel for failure to object.
>
> In order to make out a case of ineffective assistance of counsel, a defendant must show, among other things, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  (*In re Avena* (1996) 12 Cal.4th 694, 721.)  [Jenkins] cannot make that showing.
>
> The victim, E.C. refused to answer any substantive questions during the Linke interview.  Although Officer Linke make critical remarks about E.C. during the interview, a jury would understand that these remarks were not evidence and merely reflected the frustration of a police officer who was unable to get a statement from the victim.  [Jenkins] was observed engaging in sexual conduct with the victim by four independent citizen witnesses.  It was undisputed that the victim was, in fact, 16 years old at the time of the sexual conduct at issue.  Considering all these circumstances, it is not reasonably probable that [Jenkins] would have obtained a

---

[93] *Id.* at 490 (emphasis added); *see Almendarez-Torres v. United States*, 523 U.S. 224, 243-247 (1998) (recidivism is a sentencing factor, not an element of the crime that must be submitted to the jury).

better result had the Linke interview been excluded from evidence. There was no ineffective assistance of counsel.[94]

The California Court of Appeal also rejected Jenkins's argument that trial counsel was ineffective for failing to object to the admission at trial of the victim's testimony given at the preliminary hearing, holding:  "Because Evidence Code section 1291 did not bar [the victim's] preliminary hearing testimony, trial counsel was not ineffective for failing to raise a futile objection on that ground.  (*People v. Majors, supra,* 18 Cal.4th at p. 403.)."[95]

*Claims Presented in the Habeas Proceeding*

The Sacramento County Superior Court rejected Jenkins's ineffective assistance of trial counsel claims presented to it, holding:

> **The petition fails to state a prima facie claim that [Jenkins] received ineffective assistance of counsel**.
> [Jenkins] additionally asserts both of his retained trial counsel were ineffective.  Specifically, the petition alleges counsel:
> 1. Failed to conduct discovery prior to the preliminary hearing;
> 2. Failed to object after the prosecution belatedly turned over the victim's clothing;
> 3. Failed to request a continuance to have the clothing tested for [Jenkins's] DNA;
> 4. Failed to impeach prosecution witness [DMC], the victim's mother; and
> 5. Failed to object to removal of Defense Exhibit A.
> A criminal defendant has the right to counsel under both the Sixth Amendment and Article I, section 15, of California Constitution. This entitles [Jenkins] to effective assistance of counsel.  (*People v Ledesma* (1987) 43 Cal.3d 171, 215.)
> In evaluating a claim of ineffective assistance of counsel, the court applies a two-part test:  First, [Jenkins] must show his counsels' performance was "deficient" because their representation fell below an objective standard of reasonableness under prevailing professional norms.  (*In re Harris* (1993) 5 Ca1.4th 813, 832-833, citing *Strickland v. Washington* (1984) 466 U.S. 668 and *People* v. *Pope* (1979) 23 Cal.3d

---

[94] *Jenkins*, 2008 WL 2030920 at *4.

[95] *Jenkins*, 2008 WL 2030920 at *9.

412; See also *In re Scott* (2003) 29 Ca1.4th 783, 811-812.)  Second, [Jenkins] must show he was prejudiced by counsels' performance.  Specifically, [Jenkins] must show there is a reasonable probability that, but for counsels' unprofessional errors, the result would have been different.  (*Strickland* v. *Washington, supra,* 466 U.S. at 689.)

It is frequently easier to resolve a claim of ineffective assistance by looking first at the issue of prejudice: if none is established, it is unnecessary to address counsels' performance.  (*In re Fields* (1990) 51 Cal.3d 1063, 1077.)

The petition must plead facts which, if true, would entitle [Jenkins] to relief.  (*People* v. *Duvall* (1995) 9 Cal.4th 464, 475 75.)  The petition must state with particularity the facts upon which [Jenkins] is relying to justify relief  (*In re Swain* (1949) 34 Ca1.2d 300, 303-304), with the factual allegations supported by reasonably available documentary evidence or affidavits.  (*In re Harris* (1993) 5 Ca1.4th 813, 827 fn. 5)  If no prima facie case for relief is stated. the court will summarily deny the petition.  (*Duvall* at 474; *In re Clark* (1993) 5 Ca1.4th 750, 781.)  Conclusory allegations made without any explanation do not warrant relief let alone an evidentiary hearing.  (*Duval* at 474.)

Here, the petition fails to make a prima facie showing that [Jenkins] received ineffective assistance of counsel.

First, the evidence of [Jenkins's] guilt was overwhelming.  As the Court of Appeal pointed out, a number of independent citizens testified to seeing [Jenkins] and the teenager having sex for about two hours in an open area across from a street of homes.  Indeed, officers responding to the neighbors' complaints caught [Jenkins] *in flagrante delicto.*  [Jenkins] thus could not argue the acts never occurred.  Instead, his only defense was that he did not reasonably know his partner was age 16.  The petition fails to explain how any delay in producing the teenager's clothing, or counsel's response thereto, possibly prejudiced [Jenkins's] case.

The petition further alleges [Jenkins's] initial trial counsel failed to conduct adequate investigation, resulting in ineffective examination of the victim at the preliminary hearing.  (The minor subsequently refused to testify at trial.)  However, the petition fails to explain how [Jenkins] was prejudiced by counsel's alleged failure to investigate.  The minor's testimony at the preliminary hearing was not prejudicial to [Jenkins]:  She was examined effectively by [Jenkins's] counsel, recanting her previous statements to officers that were damaging to [Jenkins] and minimizing her exchange with [Jenkins].

A claim that counsel was ineffective in failing to obtain favorable evidence must show what evidence should or could have been obtained and what effect it would have had.  (*People* v. *Geddes* (1991) 1 Cal.App.4th 448, 454.)  Again, the petition fails to state a prima facie claim [Jenkins] was prejudiced by the alleged ineffective assistance of counsel.

The petition additionally alleges counsel failed to impeach the victim's mother.  However, as the Court of Appeal noted, [Jenkins's] counsel established the witness was on drugs, prompting the prosecutor to urge the jury to ignore the

testimony of the People's own witness.  Again, the petition fails to allege—much less establish—any prejudice from counsel's representation.

Finally, the petition alleges counsel erred in allowing Defense Exhibit A to be removed, and that [Jenkins's] first appellate attorney died.  Again, the petition fails to explain how either affected  the outcome of  [Jenkins's] case.[96]

First, under California law a habeas petitioner must state with particularity the facts upon which the petitioner is entitled to relief,[97] and attach the documentary evidence or affidavits that support the claim to the petition.[98]  That deficiency, however, may be cured in a renewed petition.[99]  This is deemed to be a denial on procedural grounds, leaving the state-court remedies unexhausted.[100]  Jenkins has therefore failed to properly exhaust his state-court remedies.  This Court may deny a habeas claim on the merits, the failure to exhaust notwithstanding,[101] when it is clear that the petition does not raise a colorable federal claim.[102]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Jenkins must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[103]  A deficient performance is one in which "counsel made errors so serious that

---

[96] Docket No. 17 at 49-50.

[97] *Ex parte Swain*, 209 P.2d 793, 796 (Cal. 1949).

[98] *People v. Duvall*, 886 P.2d 1252, 1258 (1995); *In re Harris*, 855 P.2d 391, 397 n. 5 (1993); *In re Clark*, 855 P.2d 729, 750 n. 16 (1993).

[99] *Swain*, 209 P.2d at 795-96.

[100] *Harris v. Superior Court*, 500 F.3d 1124, 1128 (9th Cir. 1974) (en banc).

[101] 28 U.S.C. § 2254(b)(2).

[102] *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir.2005); *see Rhines v. Weber*, 544 U.S. 269, 277 (2005) ("plainly meritless").

[103] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."[104]   Jenkins

must show that defense counsel's representation was not within the range of competence

demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for

counsel's ineffectiveness, the result would have been different.[105]   An analysis that focuses

"solely on mere outcome determination, without attention to whether the result of the proceeding

was fundamentally unfair or unreliable, is defective."[106]   In applying the latter standard, the

Supreme Court has explained that, if the outcome might have been different as a result of a legal

error, the defendant has established prejudice and is entitled to relief.[107]

     *Strickland* and its progeny do not mandate that this Court act as a "Monday morning

quarterback" in reviewing tactical decisions.[108]   Indeed, the Supreme Court admonished in

*Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction or
> adverse sentence, and it is all too easy for a court, examining counsel's defense after
> it has proved unsuccessful, to conclude that a particular act or omission of counsel

---

[104] *Id.*

[105] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

[106] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." (citing *Strickland*, 466 U.S. at 687)); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." (Citations omitted)).

[107] *See Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393.

[108] *See Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990).

was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.[109]

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[110]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[111]

While judicial inquiry into counsel's performance under *Strickland* must be highly deferential, it is "by no means insurmountable," but nonetheless remains "highly demanding."[112]

"*Strickland* does not guarantee perfect representation, only a reasonably competent attorney."[113]

"Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair

---

[109] 466 U.S. at 689 (internal citations and quotation marks omitted).

[110] *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

[111] *Id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

[112] *Morrison*, 477 U.S. at 382.

[113] *Richter*, 131 S.Ct. at 791 (internal quotation marks and citation omitted).

trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial."[114]

Jenkins bears the burden of proving that counsel's appeal strategy was deficient.  "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound . . . strategy.'"[115]  "[He] bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound . . . strategy."[116]  "In determining whether the defendant received effective assistance of counsel, 'we will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight,' but rather, will defer to counsel's sound . . . strategy."[117]  "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."[118]

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."[119]  The court must then consider those acts or omissions against "prevailing professional norms."[120]  Even then, "counsel is strongly presumed to have rendered adequate

---

[114] *Morrison*, 477 U.S. at 382.

[115] *Strickland*, 466 U.S. at 689.

[116] *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001).

[117] *Id.* (quoting *Strickland*, 466 U.S. at 689).

[118] *Strickland*, 466 U.S. at 681.

[119] *Id*. at 690.

[120] *Id*.

assistance and made all significant decisions in the exercise of reasonable professional judgment."[121]

Based upon the record before it, this Court cannot say that Jenkins has overcome the strong presumption that trial counsel's performance fell within the wide range of reasonable professional assistance, or that his defense was prejudiced by any alleged error or omission as required by *Strickland-Hill*.  Accordingly, it cannot be said that the decision of the Sacramento County Superior Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[122]  Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court decision unreasonably applied the correct legal principle to the facts of Jenkins's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state court decision was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable.  Jenkins has failed to establish that his trial counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that Jenkins's defense was prejudiced, as required by *Strickland-Hill*.  Jenkins is not entitled to relief on the ground that his trial counsel was ineffective.

---

[121] *Id*.

[122] 28 U.S.C. § 2254(d).

Ineffective Assistance  of Appellate Counsel

Reduced to its essence, Jenkins's argument is that appellate counsel was ineffective for failing to adhere to the appellate rules or to cite authority in support of arguments, thereby forfeiting meritorious claims.  The Sacramento County Superior Court did not address Jenkins's ineffective assistance of appellate counsel claim.  The failure of appellate counsel to raise meritless or weak issues does not constitute ineffective assistance of counsel.[123]  As the Sacramento County Superior Court correctly noted in denying Jenkins's relief on his ineffective assistance of trial counsel claim, an ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either one of the *Strickland* prongs.[124] This Court presumes that, had it addressed Jenkins's ineffective assistance of appellate counsel claims to the extent they are based upon the same or similar grounds as his claims of ineffective assistance of trial counsel, the Sacramento County Superior Court would have applied the same standard and reached the same result; i.e., a failure to show prejudice.

The Sacramento County Superior Court denied the following claims because Jenkins did not present them on direct appeal:

1.    The prosecution failed to comply with *Brady* by delaying release of the victim's clothes until the eve of trial.
2.    The prosecution failed to provide [Jenkins] impeachment evidence as to the People's witness [DMC], the victim's mother.

---

[123] *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) (holding that appellate counsel does not have an obligation to raise every nonfrivolous argument); *Miller v. Keeney*, 882 F.2d 1428, 1428 (9th Cir. 1989) (holding that appellate counsel's failure to raise a weak issue did not constitute ineffective counsel).

[124] *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

3.      The court erred in ruling that Defense Exhibit A had been withdrawn, thereby denying [Jenkins] the right to present a complete defense.

4.      The court improperly denied [Jenkins's] request for a transcript of his prior 1986 conviction.

5.      The prosecution knowingly used perjured testimony regarding whether the victim was placed under arrest.

6.      The court erred in informing the jury [Jenkins] was in custody pending the trial.

7.      The court relied on false information at sentencing and when it stated a court-appointed psychologist reported [Jenkins] had been arrested for an outstanding Santa Clara county warrant.

8.      The court imposed a 25-to-life sentence based on kidnapping and rape allegations that were not part of the record.

9.      [Jenkins] was sentenced on the basis of charges for which he was never convicted and that he had never admitted and facts found by the court instead of the jury.

10.     The sentence violated [Jenkins's] 1986 plea bargain on his prior convictions.

11.     [Jenkins's] sentence is disproportionate to other sentences for similar conduct.

12.     Cumulative error.[125]

As noted above, this Court has determined that the first, fourth, fifth, seventh, eighth, and ninth points were either raised on appeal or, if not raised, meritless.  Also as noted above, Jenkins's tenth point (eleventh subground claim that his 1986 plea bargain was breached) is nothing more than a restatement of his eighth and ninth points.  The Sacramento County Superior Court found that the third point was factually unsupported and without merit.  Thus, to the extent that the alleged omissions were raised and rejected on appeal or in his state habeas proceeding, Jenkins's ineffective assistance of counsel claim fails on the facts.  To the extent they are meritless, the failure of appellate counsel to raise them on appeal could not constitute ineffective assistance.

---

[125] Docket No. 17 at 48.

As for his eleventh point, that the sentence imposed was disproportionate, he could not prevail.  Although Jenkins may have received a severe sentence and the Eighth Amendment prohibits sentences that are grossly disproportionate to the crime, "outside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare."[126]  Balanced against the proportionality principle is the corollary principle that the determination of prison sentences is a legislative prerogative not within the province of the courts.[127]  The Ninth Circuit has held that "'only extreme sentences that are grossly disproportionate to the crime' violate the Eighth Amendment."[128]

To determine proportionality, a court must examine: "(1) 'the gravity of the offense and the harshness of the penalty'; (2) 'the sentences imposed on other criminals in the same jurisdiction'; and may include (3) 'the sentences imposed for commission of the same crime in other jurisdictions.'"[129]  Balanced against the proportionality principle is the corollary principle that the determination of prison sentences is a legislative prerogative not within the province of the courts.[130]  Also, as noted in 1991, the decisions of the Supreme Court regarding proportionality to that time had not always been clear or consistent in all respects and its precise

---

[126] *Solem v. Helm,* 463 U.S. 277, 289-90 (1983) (internal alterations and emphasis omitted).

[127] *Rummel v. Estelle*, 445 U.S. 263, 275-76 (1980).

[128] *Cacoperdo v. Demosthenes,* 37 F.3d 504, 507 (9th Cir.1994) (quoting *United States v. Bland,* 961 F.2d 123, 129 (9th Cir.1992)).

[129] *Id.* at 507 (quoting *Helm,* 463 U.S. at 290-92).

[130] *Rummel*, 445 U.S. at 275-76.

contours unclear.[131]   It is against this backdrop of the law as it existed at the time the California

courts rendered their decisions that those decisions must be examined.

Initially this Court looks to *Rummel*, *Helm*, and *Harmelin* for guidance.  In *Rummel*, the

Supreme Court rejected the argument that a life sentence with the possibility of parole upon

conviction of obtaining $120.75 by false pretenses violated the Eighth Amendment where the

defendant's criminal history consisted solely of the fraudulent use of a credit card to obtain $80

worth of goods and passing a forged check in the amount of $28.36.  In *Helm* the Supreme Court

found a sentence of life without the possibility of parole upon conviction of uttering a no account

check for $100 based on a criminal history of seven nonviolent felonies violated the Eighth

Amendment.  In *Harmelin*, the Supreme Court upheld against an Eighth Amendment challenge a

mandatory life sentence without the possibility of parole upon conviction for possession of more

than 650 grams of cocaine without consideration of mitigating factors, such as the fact the

defendant had no prior felony convictions.  As the Ninth Circuit has observed:

> [T]he Supreme Court has noted that proportionality analysis under the Eighth
> Amendment should be guided by objective criteria, including: "(i) the gravity of the
> offense and the harshness of the penalty; (ii) the sentences imposed on other
> criminals in the same jurisdiction; and (iii) the sentences imposed for commission of
> the same crime in other jurisdictions."  *Solem v. Helm,* 463 U.S. 277, 292, 103 S.Ct.
> 3001, 77 L.Ed.2d 637 (1983).  Despite this, the Supreme Court has not uniformly
> applied this three step analysis.  *See, e.g., Harmelin v. Michigan,* 501 U.S. 957, 1005,
> 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *Rummel v. Estelle,* 445 U.S. 263, 285, 100
> S.Ct. 1133, 63 L.Ed.2d 382 (1980).
>
> In an attempt to resolve this inconsistency, the Supreme Court has explicitly
> identified that which constitutes "clearly established federal law" in its Eighth
> Amendment jurisprudence for the purpose of habeas review.  Specifically, in *Lockyer
> v. Andrade,* 538 U.S. 63, 72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), after
> conceding that its "precedents in this area have not been a model of clarity," the
> Court held that "one governing legal principle emerges as 'clearly established' under

---

[131] *See Harmelin v. Michigan*, 501 U.S. 957, 997-98 (1991) (Kennedy, J. concurring).

§ 2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years." *Lockyer,* 538 U.S. at 72, 123 S.Ct. 1166. In so holding, the Court made no mention of any constitutional imperative requiring that courts make the various intra- and inter-jurisdictional comparisons recommended by the *Solem* court. *See id.* Instead, the Supreme Court held that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Id.* at 73, 123 S.Ct. 1166.[132]

A punishment may violate California's constitutional prohibition against cruel and unusual punishment if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.[133]

> To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. If the court concludes that the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], or, that the punishment shocks the conscience and offends fundamental notions of human dignity, the court must invalidate the sentence as unconstitutional.[134]

The California Supreme Court has noted that its principle is similar to the Federal principle.[135] Under California law, a defendant has a considerable burden to overcome in challenging a penalty as cruel and unusual: the validity of legislative enactments will not be

---

[132] *Nunes v. Ramirez-Palmer*, 485 F.3d 432, 438-39 (9th Cir. 2007).

[133] *See People v. Cunningham*, 25 P.3d 519, 596 (Cal. 2001); *People v. Dillon*, 668 P.2d 697, 720 (Cal. 1983).

[134] *People v. Hines*, 938 P.2d 388, 443-44 (Cal. 1997) (citations and internal quotation marks omitted).

[135] *Dillon*, 668 P.2d at 719 n.25 (citing *Helm*).

49

questioned unless their unconstitutionality clearly, positively and unmistakably appears.[129]

Independent research by this Court did not uncover any published or unpublished decision of a

California appellate court that even remotely suggested that the imposition of the twenty-five

years to life sentence under the "three strikes" law for sexual offenses involving a minor violated

the California Constitution.  In light of the decision of the California Court of Appeal denying

Jenkins's *Romero* claim, it cannot be said that had appellate counsel specifically raised the

disproportionate claim on appeal, he would have prevailed under either the California or the

Federal standard.

As to Jenkins's remaining contentions, the Court finds them to be meritless.  Jenkins's

second point, that appellate counsel failed to raise the issue that the prosecution failed to provide

evidence of the mother's prior convictions for impeachment purposes was harmless.  As the

Sacramento County Superior Court noted in rejecting Jenkins's related ineffective assistance of

trial counsel claim, trial counsel argued that the mother was on drugs and the prosecutor urged

the jury to disregard her testimony.[130]  Jenkins's sixth point, failure of appellate counsel to raise

the issue that the trial court erred in informing the jury that Jenkins was in custody, is

unsupported by any facts or reference to the record.  Jenkins did not testify.  The Sacramento

County Superior Court found that, because several independent citizens observed Jenkins having

sex with the teenage victim, the evidence of Jenkins's guilt was overwhelming.[131]  The Court of

Appeals also noted that the only defenses Jenkins could possibly have made were that he either

---

[129] *People v. Wingo*, 534 P.2d 1001, 1006 (Cal. 1975).

[130] Docket No. 17 at 50.

[131] Docket No. 17 at 50.

did not commit the acts or that he believed in good faith that the victim was at least eighteen years of age.[132]  As to any argument that Jenkins did not commit the acts, not one of his alleged errors, even if raised by appellate counsel, could have negated the clear testimony of the independent witnesses.[133]

Cumulative Error

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness."[134]  This Court has considered and rejected the errors Jenkins seeks to cumulate; to the extent there was any error, his trial was not rendered fundamentally unfair.[135]

Examining the remaining items raised in his state habeas petition, even if he were correct that they were errors, they neither individually nor cumulatively compel a finding that Jenkins did not do the acts, or that he harbored a good faith belief that the victim was eighteen.  This Court cannot say that the presumed decision of the Sacramento County Superior Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable

---

[132] *Jenkins*, 2008 WL 2030920 at 12.

[133] This Court also notes that Jenkins's arguments *vis-a-vis* the victim's clothing and the DNA, the uncontradicted evidence was that she was naked during the sexual acts.  The absence of any semen on her clothing would not have disproved that he had intercourse with the victim.

[134] *Peyton v. Cullen,* 658 F.3d 890, 896-97 (9th Cir.2011) (citing *Chambers v. Mississippi,* 410 U.S. 284, 298, 302-03 (1973)).

[135] *Id.*

determination of the facts in light of the evidence presented in the State court proceeding."[136] Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of Jenkins's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state court decision was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable.  Jenkins has failed to establish that his appellate counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that his defense was prejudiced, as required by *Strickland-Hill*.  In particular, Jenkins has failed to establish any reasonable probability that the outcome on appeal would have differed had appellate counsel raised the issues he contends were omitted.  Jenkins is not entitled to relief on his claim that he was denied the effective assistance of appellate counsel.

---

[136] 28 U.S.C. § 2254(d).

V.  CONCLUSION AND ORDER

Jenkins is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** Jenkins's request for an evidentiary hearing is

**DENIED.**

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[137]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[138]

The Clerk of the Court is to enter judgment accordingly.

Dated:  November 15, 2012.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[137] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).

[138] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.